UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID PAUL DAVENPORT,<br><br>              Plaintiff,<br><br>        v.<br><br>BOARD OF TRUSTEES OF THE STATE CENTER COMMUNITY COLLEGE DISTRICT,<br><br>              Defendant. | 1:07-cv-00494 OWW SMS<br><br>**MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 75)** |

## I. INTRODUCTION.

Plaintiff David Paul Davenport ("Davenport") brings this *pro se* action under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e-3(a), based on a claim of unlawful retaliation by Plaintiff's former employer, Defendant State Center Community College District ("District"). Davenport alleges the District suspended him in May 2002 and fired him in January 2003 in retaliation for a sexual harassment and discrimination complaint he submitted to the District against his supervisor, Dr. Margaret E. Mericle.

Before the court for decision is Defendant's Motion for Summary Judgment. Defendant moves for summary judgment on the

1

1  grounds that Plaintiff's retaliation claim under Title VII is
2  barred by the applicable statutes of limitations. Specifically,
3  Defendant argues that any claim for retaliation based on alleged
4  acts prior to and including the date of the Board of Trustees'
5  decision to terminate Plaintiff, which was January 7, 2003, is
6  barred because Plaintiff did not submit his claim to the Equal
7  Employment Opportunity Commission ("EEOC") within the Title VII
8  filing limitations period as required by 42 U.S.C. § 2000e-5(e)(1).

9        In the alternative, Defendant seeks summary judgment on the
10  following grounds: 1) Plaintiff cannot prove a prima facie of
11  retaliation because there is no evidence that he engaged in
12  protected activity; 2) Defendant had a legitimate, non-
13  discriminatory reason for terminating Plaintiff's employment,
14  namely that Plaintiff was dishonest, unfit for service, and refused
15  to obey laws and regulations, and Plaintiff has not presented
16  evidence giving rise to a triable issue as to any pretext; and 3)
17  because Plaintiff failed to diligently pursue his Title VII
18  retaliation action for three years, opting to focus on his
19  unsuccessful state court appeal, Plaintiff's Title VII action is
20  barred by the doctrine of laches.

21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

**2**

1

## II. **FACTUAL BACKGROUND**.[1]

2

**A.    Termination and State Court Appeals (2002-2005)**

3    In August 1990, the District hired Plaintiff as a history
4    professor on its Fresno City College campus. (DSUF 1.) On May 1,
5    2002, Mr. Randy Rowe, Associate Vice Chancellor of Human Resources
6    for the District, received a memo from the Interim-President of
7    Fresno City College indicating concerns over Plaintiff's potential
8    sexual harassment of students. (Rowe Decl. ¶ 5.) On May 6, 2002,
9    the District, via Mr. Rowe, placed Plaintiff on administrative
10   leave with pay, pending an investigation into allegations of
11   misconduct against Plaintiff by Fresno City College students and
12   District staff members. (DSUF 2.) Mr. Rowe personally delivered
13   the letter on May 6, 2002, which set forth the reasons for placing
14   Plaintiff on administrative leave.

15   On November 8,2002, following the investigation, Mr. Rowe sent
16   Plaintiff a letter notifying him of the District's intent to
17   initiate termination proceedings against him. (DSUF 3.) On
18   December 3, 2002, the District provided Plaintiff with a pre-
19   termination *Skelly* hearing, during which Plaintiff and his
20   representative, Zwi Reznik, had the opportunity to rebut the
21   charges against Plaintiff. (DSUF 4.) On January 7, 2003, the

22

23

24   [1] Unless otherwise noted, the facts are undisputed. (See
     Stmt. of Undisp. Facts in Support of Def.'s Mot. for Summ. J.
25   ("DSUF"), filed by Defendant on June 30, 2009). Plaintiff objects
     to much of the evidence submitted by Defendant on various grounds.
26   Virtually all of Plaintiff's objections are without merit. To the
     extent that Plaintiff's sole dispute with facts is based upon the
27   inadmissability of Defendant's evidence, and is not disputed by any
     admissible evidence submitted by Plaintiff, these facts are viewed
28   as undisputed.

Board of Trustees voted to terminate Plaintiff's employment based on dishonesty, evident unfitness for service, and persistent violation of, or refusal to obey, the school laws of the state or District regulations.[2]  (DSUF 5-6.)

Following the Board's January 7, 2003 decision to terminate his employment, Plaintiff filed an appeal with the Office of Administrative Hearings.  (DSUF 29.)  Administrative Law Judge Stephen J. Smith provided a full evidentiary hearing, where Plaintiff was represented by legal counsel.[3]  (DSUF 29, 30.)  On January 21, 2004, ALJ Smith issued a 43-page written order upholding the District's decision. (DSUF 31.)

Plaintiff appealed ALJ Smith's decision to the Fresno County Superior Court, which denied Plaintiff's request on June 22, 2004. (DSUF 32.)  Plaintiff then appealed the Superior Court's decision to the Fifth District Court of Appeal.  On October 21, 2005, the Fifth District Court of Appeal issued a 37-page opinion affirming the judgement in the District's favor.  (DSUF 34.)  Following the Fifth District's ruling, Plaintiff petitioned the California Supreme Court to review the Fifth District's decision regarding his termination.  (DSUF 36.)  The California Supreme Court denied Plaintiff's petition in December 2005.  (DSUF 36.)

---

[2]  The District's stated grounds for dismissal are three of eight enumerated grounds listed in Education Code section 87732 as authority for terminating a tenured faculty member.

[3] Plaintiff's administrative hearing took place on September 15, 16, 17, 18, 22, 23, and 24, 2003.

**4**

**B.    Plaintiff's Interactions with the DFEH and EEOC (2002-2006)**

   **1. Background on Obtaining a "Right to Sue" letter[4]**

   Initially, a complainant meets with a DFEH consultant for an intake interview and completes a pre-complaint questionnaire. (DSUF 10.)  Based on the information the individual provides, the DFEH consultant determines whether the DFEH will accept or reject the charge.   (DSUF 11.)   If the DFEH accepts the charge, a complaint is typed, the complainant signs the complaint, and DFEH serves it on the alleged offending entity.  (DSUF 11.)  If the DFEH rejects the charge, it sends the complainant a cover letter notifying the complainant that he or she must complete and return an enclosed "verified complaint."  (DSUF 12.)  The DFEH refers to the verified complaint as a "B Complaint."   (DSUF 12.)   The verified or "B Complaint" is partially completed by the DFEH before it is mailed to the complainant, but in order to receive a Right to Sue notice, the complainant must sign and date the B Complaint, and submit it to the DFEH.  (DSUF 13-14.) The DFEH does not consider a complaint "filed" until it receives a signed and dated B Complaint. (DSUF 15.)

   When the DFEH receives a signed and dated B Complaint, it stamps the complaint as filed that day.  (DSUF 16.)  The DFEH then issues a Right to Sue notice to the complainant and a notice to the employer that the complaint has been filed and closed. (UMF 17.) Even if a complainant files an untimely B Complaint beyond the statute of limitations period, the DFEH will stamp it received and

---

   [4] Background provided by Ms. Geraldine Reyes, District Administrator of the DFEH (nine counties, including Fresno) since 1996, and Mr. Rafael Gonzalez, DFEH Consultant from 1998 to 2003.

issue a Right to Sue notice. (DSUF 18.) If a complainant does not immediately return a B Complaint, the DFEH does not actively require the complainant to follow-up.[5] (DSUF 19.)

### 2. DFEH

On November 19, 2002, during his suspension but prior to his dismissal, Plaintiff met with California Department of Fair Employment and Housing ("DFEH") consultant Rafael Gonzalez and completed a pre-complaint questionnaire. (DSUF 7, 21.) Plaintiff discussed the circumstances of his dismissal with Mr. Gonzalez, who told Plaintiff he would review the material and get back to him. (DSUF 21.)

On November 25, 2002, Mr. Gonzalez issued a letter to Plaintiff explaining that the DFEH would not pursue a complaint on his behalf. (DSUF 22.) The letter was signed by Mr. Gonzalez and contained two enclosures, a "Notice of Discrimination Complaint Accepted for Filing Purposes" and a partially completed "Complaint of Discrimination" or "B Complaint." (Doc. 79, Exh C.) The November 25 DFEH letter explained that Plaintiff needed to submit a completed B Complaint in order to obtain a "Right to Sue" notice and file a lawsuit:

> I apologize for taking longer than expected in getting back to you regarding your wish to file a complaint with this agency ... Therefore, based on this Consultant's review of your situation and a review of the documentation provided, a complaint for investigation will not be taken on your behalf. As I

---

[5] "Once [the DFEH has] sent [the B Complaint] out, [they are] done, and it's the responsibility of the charging party to get it back to [DFEH] in a timely manner so that [the DFEH] can file it." (Reyes Dep. 43:7-43:23.)

indicated to you, I will be including in this letter a "B" Complaint for filing purposes, which will be served on the Respondent once you provide the form back. You will also be issued a "Right To Sue" shortly thereafter, which will authorize you to file a private law suit on your own behalf if you so desire.

(Doc. 79, Exh. C.)

The enclosed "Notice of Discrimination Complaint Accepted for Filing Purposes" reads in part:[6]

Your allegation of discrimination against Fresno City College has been considered. The Department of Fair Employment and Housing will file your complaint. Analysis of the facts and circumstances which you allege indicates that further investigation is not warranted. As the Department has determined that it will not be issuing an accusation of discrimination, you will be advised by mail of your right to file a private lawsuit.

(Doc. 79, Exh. C.)

The parties dispute what happened next. According to Defendant, after Mr. Gonzalez sent Plaintiff the November 25, 2002 letter and B Complaint, the DFEH did not receive any other communications from Plaintiff until June 2, 2006. (DSUF 26.) Defendant states that had the DFEH received written communication from Plaintiff, it would have been included in the DFEH's file. (DSUF 27.) The DFEH's file concerning Plaintiff's allegations does not contain any communication from Plaintiff, including the signed B Complaint, until June 2, 2006. (DSUF 28.)

Plaintiff maintains he completed the B Complaint form included with the letter and notice and returned it by mail on November 30, 2002. According to Plaintiff, he "corrected, completed, signed,

---

[6] At the top of the page the attachment reads, "Discrimination Complaint Accepted for Filing Purposes," and this text is underlined, bolded, and capitalized.

dated, and mailed it to Mr. Gonzalez on November 30, 2002." (Opp page 6)

It is undisputed that the only signed complaint in the DFEH file was a file-stamped complaint received on June 2, 2006.[7]  The form shows Plaintiff's handwritten signature and a corresponding handwritten date of November 30, 2002.  The form also contains fax information printed across the top of the document indicating that it was faxed to the DFEH on June 2, 2006 from the fax number 559-227-9355.

On June 6, 2006, Plaintiff contacted the DFEH regarding his complaint.  He eventually spoke to Ms. Geraldine Reyes, District Administrator.  (DSUF 43.)  It is undisputed that this was the first time he had spoken with anyone at DFEH since 2002.  (DSUF 43.)  According to Defendant, Plaintiff asked Ms. Reyes to issue a Right to Sue notice backdated to 2002.  (DSUF 44.)  Ms. Reyes told Plaintiff that DFEH had no record of him filing his B Complaint in 2002 and refused to backdate the notice. (DSUF 45.)

On August 17, 2006, the DFEH issued Plaintiff a Right to Sue notice, informing him that he needed to file a complaint with the EEOC in order to obtain a Right to Sue in federal court.  (DSUF 46.) Plaintiff filed a complaint with the EEOC on November 27,2006.  (DSUF 47.)  The EEOC issued Plaintiff a "Right to Sue" notice on December 29, 2006.  (DSUF 48.)  The EEOC notice stated, "[y]our charge was not timely filed with the EEOC, in other words you waited too long after the date(s) of the alleged discrimination to

---

[7] The complaint shows a DFEH date stamp of June 2, 2006 in a box which reads "Received Dept. Of Fair Employment & Housing Fresno District Office" in the lower right-hand corner of the page.

**8**

file your charge."

In April or May 2008, Plaintiff again contacted Ms. Reyes in an attempt to have his Right to Sue notice backdated to 2002. (DSUF 49.) Ms. Reyes denied Plaintiffs request because the DFEH had no record of him filing a complaint until June 2,2006.   (DSUF 50.) Ms. Reyes then sent Plaintiff a confirming letter, repeating her denial:

> This letter is to memorialize our conversation regarding your request to receive a right to sue letter back-dated sometime in or about November 22, 2002.  As I have informed you, we have no record of receiving a signed Complaint for the Purpose of Filing Only ("B" Complaint) in or about November 22, 2002. We do have a record of you contacting the Department in June of 2006.   The documentation included a "B" Complaint dated November 30, 2002.  Unfortunately, we were unable to backdate the complaint and therefore the Department filed it effective June 2, 2006.

(Doc. 79, Exh. E.)


### 3.   Plaintiff's Alleged Sexual Harassment Complaint

According to Plaintiff, the District retaliated against him for filing an internal sexual harassment complaint against his supervisor, Dean of Instruction Peg Mericle, on March 19, 2002.  In his EEOC pre-complaint questionnaire he claimed that he submitted the harassment complaint to the District's Vice President of Instruction, Tony Cantu, and Ms. Mericle. In his Complaint, Plaintiff claimed he delivered the harassment complaint only to Mr. Cantu.   In his FAC, Plaintiff claims he submitted copies to Mr. Cantu's secretary and Robert Fox, Dean of Students', secretary.  In his April 2 7,2009 deposition, Plaintiff claimed he provided the complaint to Dean Mericle, Mr. Cantu's secretary, and Dean Fox's

secretary.

The District has no record of the harassment complaint being filed nor has Mr. Cantu or Dean Mericle ever received a harassment complaint from Plaintiff.  (DSUF 53.)  In his declaration, Mr. Rowe states that he did not learn of Plaintiff's allegations against Dean Mericle until April 27, 2009, during Plaintiff's deposition. (Rowe Decl. ¶ 11.)  According to Mr. Rowe, the complaint Plaintiff alleges he submitted is typed on a complaint form that the District did not use in 2002. (DSUF 54.)  Mr. Rowe stated that Plaintiff's form contains the names of two district campuses that were renamed prior to 2002 and does not contain the names of several District campuses that were added in the 1990's.  (DSUF 54.)

### III. <u>PROCEDURAL BACKGROUND</u>.

On March 29, 2007, Plaintiff filed a complaint for retaliation against Defendant, alleging that the District violated Title VII of the Civil Rights Act of 1964 when it terminated his employment on January 7, 2003.  (Doc. 1.)  Plaintiff also asserted a state law claim for wrongful termination.

Defendant filed a Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), or in the Alternative, Motion for a More Definite Statement Pursuant to Fed. R. Civ. P. 12(e) on June 22, 2007.  (Doc. 14.)  Plaintiff responded by filing "Plaintiff's Response to Defendant's Motion to Dismiss and to Defendant's Memo. of P & A" on July 25, 2007, opposing Defendant's motion.  (Doc. 17.)  Plaintiff attached various letters to his response, including correspondence between him and Mr. Rowe, a page of the administrative hearing transcript, and a page of the Fifth

10

District Court of Appeal's opinion.[8]   (*Id.*)

Defendant's motion was granted on January 17, 2008, although Plaintiff was permitted leave to amend his cause of action under Title VII.  (Doc. 36.)  Defendant's challenge to Plaintiff's state law wrongful termination claim was granted without leave to amend.

On March 12, 2008, Plaintiff filed his First Amended Complaint, attaching letters and other documents from and to the DFEH, pre-complaint questionnaires from DFEH and EEOC, the bargaining agreement between the District and the teachers' union, and correspondence from Mr. Rowe, among other items.  (Doc. 40.)

Defendant filed its Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), or in the Alternative, Motion to Strike Pursuant to Fed. R. Civ. P. 12(f) on April 23, 2008.  (Doc. 44.)   Defendant filed its Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 on May 14, 2008.  (Doc. 48.)

Plaintiff filed his opposition to both motions in Plaintiff's Response to the Defendant's Response to Plaintiff's Amended Complaint and Defendant's Motions to Dismiss and to Impose Sanctions on May 23, 2008.  (Doc. 52.)

Defendant's motion to dismiss was granted, in part, on March

---

[8] Defendant filed a reply on August 20, 2007, along with a request for judicial notice of four documents: the discrimination complaint Plaintiff filed with DFEH and the corresponding letters from DFEH to Plaintiff and the District closing the case; the administrative law judge's decision; the Fresno County Superior Court's decision; and the California Fifth District Court of Appeal's opinion.  (Docs. 19 and 20.)

11

31, 2009.[9]   (Doc. 66.) Defendant's motion to dismiss Plaintiff's Title VII retaliation claims was denied as to the alleged retaliatory acts occurring prior to and including the date of termination.   Defendant's motion to dismiss Plaintiff's post-employment retaliation claims was granted without leave to amend.

Defendant District filed its answer to Plaintiff's First Amended Complaint on April 10, 2009.

Plaintiff filed a "Motion to Sanction Defendant" on June 15, 2009.   (Doc. 74.)

Defendant moved for summary judgment on June 30, 2009.   (Doc. 75.)   With its motion, Defendant filed a Statement of Undisputed Facts, supported by the deposition testimony of Plaintiff, Rafeal Gonzalez, and Geraldine Reyes, as well as the declarations of Anthony Cantu, Randy Rowe, and Margaret Mericle.   (Docs. 77-82.) Defendant seeks summary judgment on the following grounds: 1) Defendant's claim for retaliation is barred because Plaintiff did not submit his claim to the EEOC within the Title VII filing limitations period as required by 42 U.S.C. § 2000e-5(e)(1); 2) Plaintiff cannot prove a prima facie of retaliation because there is no evidence that he engaged in protected activity; 3) Defendant had a legitimate, non-discriminatory reason for terminating Plaintiff's employment, namely that Plaintiff was dishonest, unfit for service, and refused to obey laws and Regulations; and 4) because Plaintiff failed to diligently pursue his Title VII retaliation action for three years, opting to focus on his unsuccessful state court appeal, Plaintiff's action is barred by

---

[9] Plaintiff's motion for sanctions was denied.   (Doc. 66.)

12

the doctrine of laches.

Plaintiff filed his opposition to Defendant's summary judgment motion on August 3, 2009.  (Doc. 90.)   In support of his opposition, Plaintiff submitted over 500 pages of documentation: (1) a 20-page Memorandum of Points and Authorities opposing the motion ("Memorandum"); (2) a 169-page "Separate Statement of Undisputed Material Facts in Response to Defendant's Summary Judgment Motion," consisting of excerpts from DFEH communications, recommendations from members of Plaintiff's Civil War Re-enactment group, and the District's disciplinary findings; (3) a 45-page Opposition to Defendants' Statement of Undisputed Material Facts; (4) the 95-page unsigned declaration of Zwi Resnik, consisting of the District's January 7, 2003 dismissal order and assorted excerpts of deposition testimony; (5) Plaintiff's own 151-page affidavit, to which Plaintiff attached a number of student evaluations and correspondence between Plaintiff and various entities (primarily the EEOC, DFEH and Defendant); and (6) the affidavit of Donald G. Larson.  (Docs. 88-93.)

Plaintiff opposes summary judgment on grounds that he mailed his "B" Complaint to the DFEH on November 30, 2002, making it timely under the applicable statutes.  Plaintiff argues that a genuine dispute of fact exists because he did not fax the "B" Complaint to the DFEH on June 2, 2006, as alleged by Defendant. Plaintiff also argues that there is a triable issue of material fact as to whether equitable tolling should apply.

As to the merits of his Title VII action, Plaintiff argues he engaged in protected activity when he filed a sexual harassment complaint on March 19, 2002.  Plaintiff also contends that there is

no evidence of a legitimate reason for his termination because he never received a negative performance review.

On August 10, 2008, Defendant filed a reply and evidentiary objections. (Docs. 94 & 95.) Defendant objects to the following: (1) the letters of reference attached to Plaintiff's opposition to Defendant's Statement of Undisputed Facts; (2) the unsigned declarations of Mr. Greg Shaum, Mr. Jagmeet Chann, and Mr. Jerome Torstensen attached to Plaintiff's Opposition to Defendants' Motion; (3) the declaration of Mr. Stephen Richardson, which was not signed under penalty of perjury; (4) the unsigned declaration of Mr. Zwi Resnik; (5) the unsworn affidavit of Mr. Donald Larson; and (6) portions of the declarations of Plaintiff and Mr. Steve Armes.

A.   <u>Evidentiary Objections</u>

   1.   <u>Declarations of Greg Shaum, Jagmeet Chann and Jerome Torstensen</u>

Defendant objects to the declarations of Greg Shaum, Jagmeet Chann and Jerome Torstensen on grounds that they do not comply with 28 U.S.C. § 1746.  The supporting declarations are signed by the respective declarant under the statement, "Respectfully Submitted." The only foundation for each witnesses' declaration is in the first paragraph: "I have personal knowledge of the facts set forth below and will testify to these facts at trial."

The declarations of Greg Shaum, Jagmeet Chann and Jerome Torstensen, submitted by Respondent on August 3, 2009, do not comply with 28 U.S.C. § 1746, which requires that a declaration be subscribed as true under penalty of perjury, and be executed substantially in the statutory form, which requires a declaration

to swear "under penalty of perjury that the foregoing is true and correct." 28 U.S.C. § 1746. Although a lack of swearing is not a fatal defect, the declaration must be made under penalty of perjury and must be attested to be true. *Cobell v. Norton*, 310 F.Supp.2d 77, 84 (D.D.C. 2004) (statement of truth based on "knowledge, information, and belief" insufficient); *Kersting v. United States*, 865 F.Supp. 669, 776-77 (D. Haw. 1994) (necessary elements are that the unsworn declaration contains the phrase "under penalty of perjury" and states that the document is true).

Here, the declarations state only that the declarant has "personal knowledge of the facts" and "will testify to these at trial." The nature and extent of that qualification is uncertain, each declaration lacks any corresponding indicia of truthfulness. The declarations of Greg Shaum, Jagmeet Chann and Jerome Torstensen do not conform with 28 U.S.C. § 1746. The contents are not a sworn affidavit in opposition to summary judgment under Rule 56 of the Fed. R. Civ. Proc. 56. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

### 2.   Affidavit of Donald G. Larson

Defendant objects to the affidavit of Donald G. Larson on grounds that it does not comply with 28 U.S.C. § 1746. Like the declarations of Greg Shaum, Jagmeet Chann and Jerome Torstensen, Mr. Larson signs his affidavit under the statement, "Respectfully Submitted" there is no attestation to the truth, rather only the conclusion: "I have personal knowledge of the facts set forth below and will testify to these facts at trial." Mr. Larson's affidavit is not made under penalty of perjury and he does not otherwise

attest that the contents are true.

Attached to Mr. Larson's affidavit is a jurat in which a notary acknowledges that Mr. Larson was in fact the person who signed Plaintiff's affidavit.  However, the jurat does not indicate that Mr. Larson was sworn nor that he attested to the truth of the affidavit.   This lack of sworn attestation violates California Government Code § 8202, subsection (b), which provides that the there be a jurat attached to the affidavit stating: "Subscribed and sworn to (or affirmed) before me on this [date]," and Fed. R. Civ. Proc. 56 requiring affidavits under oath.

Because Mr. Larson's declaration neither satisfies the requirements of 28 U.S.C. § 1746, does not comport with Cal. Gov. Code § 8202, and violates Rule 56(e), the statements are insufficient to constitute any evidence to support Plaintiff's opposition.


### 3.   Declaration of Zwi Reznik

Defendant objects to the unsigned, undated, and unsworn declaration of Zwi Reznik on grounds that it is does not comply with 28 U.S.C. § 1746, Federal Rule of Civil Procedure 56(e), or Eastern District Local Rule 56-260(d).

Plaintiff filed, with his opposition, an unsigned document entitled "Declaration of Zwi Reznik."  The unsigned document states that "On the evening of March 18, 2002, while Dr. Davenport and I were waiting for Dr. Mericle in the courtyard of the Social Science Building, Dr. Davenport allowed me to read a memorandum he had written to and about Dr. Mericle in which he described harassment to which he (and others) had been subjected."  Reznik's unsigned

16

document also described Plaintiff's actions at his January 7, 2003 termination hearing: "I was also present on January 7, 2003, when Plaintiff referred to this complaint during his presentation to the Board of Trustees."

Federal Rule of Civil Procedure 56(e)(1) provides that "a supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Verification requirements for an affidavit are satisfied so long as the unsworn declaration contains the phrase "under penalty of perjury" and states that the document is true. *Kersting v. U.S.*, 865 F.Supp. 669 (D. Haw. 1994); *see also* 28 U.S.C. § 1746. Declarations made under penalty of perjury which are submitted in lieu of affidavits are subject to the same requirements as affidavits submitted to support and oppose summary judgment. *Capital Cities/ABC, Inc. v. Ratcliff*, 953 F.Supp. 1228 (D. Kan. 1997), *aff'd* 141 F.3d 1405 (10th Cir. 1998), *cert. denied* 525 U.S. 873 (1998). Here, Reznik's declaration is unsigned, stating only, "I have personal knowledge of the facts set forth below and will testify to these facts at trial." As there is no signature on Reznik's declaration and the declaration does not meet the requirements for a declaration opposing summary judgment, the declaration is not valid evidence for the purposes of deciding the Defendant's motion for summary judgment on the merits.[10]

_____

[10] On August 14, 2009, Plaintiff submitted the amended declaration of Zwi Reznik. (Doc. 100.) Mr. Reznik's amended declaration was signed, but was not made under penalty of perjury and he does not otherwise attest that the contents are true. The allegations contained therein cannot be considered as a sworn

**4.  Declaration of Stephen R. Richardson**

Defendant objects to the unsigned, undated, and unsworn declaration of Mr. Richardson on grounds that it is does not comply with 28 U.S.C. § 1746.  Defendant also objects because Mr. Richardson's unsworn declaration is inconsistent with his April 27, 2009 deposition testimony.

In opposition to the Defendant's motion for summary judgment, Plaintiff filed a document entitled "Declaration of Stephen R. Richardson."  The unsworn document, signed on July 27, 2009, declared that "On the evening of March 18, 2002, I read the memo Dr. Davenport wrote regarding harassment by his supervisor, Dr. Mericle, which he planned to submit to her supervisor and to the college sexual harassment office on March 19, 2002."  Mr. Richardson also provides several statements concerning Plaintiff's dealings with the DFEH: "Dr. Davenport received a letter dated November 25, 2002, from the case worker, Mr. Rafeal Gonzalez, together with two sheets of paper... the second item was a partially completed form DFEH-300-04 which I saw Dr. Davenport correct, complete, sign, date, and mail back to Mr. Gonzalez on November 30, 2002."  Mr. Richardson also declares that "I know Dr. Davenport wrote many letters to Mr. Gonzales at the DFEH from 2002 to 2006 because I saw him writing this letter and he usually asked me to proof read them before he mailed them."

As with the declarations of Greg Shaum, Jagmeet Chann and Jerome Torstensen, and the affidavit of Mr. Larson, Mr. Richardson signs his declaration with the statement, "Respectfully Submitted"

affidavit in opposition to summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

and the only qualification of truth is found in the first paragraph: "I have personal knowledge of the facts set forth below and will testify to these facts at trial." Mr. Richardson's affidavit is not made under penalty of perjury and he does not otherwise attest that the contents are true.

The words that the declarant has "personal knowledge of the facts" and "will testify to these at trial," do not comply with 28 U.S.C. § 1746. The nature and extent of that qualification is uncertain and lacks any corresponding indicia of truthfulness. The allegations contained in Mr. Richardson's declaration are not valid evidence and cannot be considered in opposition to Defendant's motion for summary judgment.

Mr. Richardson's declaration is flawed for another reason, namely that it expressly contradicts his April 27, 2009 deposition testimony. In his sworn deposition testimony, Mr. Richardson stated that he did not remember the form number on the documents he allegedly saw, but if the document were in front of him, he could confirm the document. Defendant's counsel then presented him with a December 6, 2006 letter from Plaintiff to Mr. Gonzalez and asked him if that was the document he observed Plaintiff mail in November 2002. (Dep. of S. Richardson, 32:5-32:9.) Mr. Richardson responded, "this is the one I remember reading. I'm presuming it is the one he mailed, yes." (Dep. of S. Richardson, 40:12-40:22.) According to Defendant, the December 6, 2006 letter is patently distinguishable from Form DFEH-300-04 (the "B" Complaint) Plaintiff claims he mailed to DFEH on November 30, 2002. Mr. Richardson's "presumption" is legally insufficient guessing that lacks the foundation of personal knowledge that Plaintiff mailed a letter in

November 2002.

### 5. <u>Plaintiff's Affidavit</u>

Plaintiff's opposition includes his 151-page affidavit with 46 exhibits.  Unlike the other declarations and affidavits filed in support of Plaintiff's opposition, Plaintiff's declaration contains a "penalty of perjury" undertaking, a signature, and a date.

Defendant objects to large portions of Plaintiff's declaration on various grounds, including relevance, hearsay, and lack of foundation/personal knowledge.

Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits supporting and opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters therein."

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed R. Evid. 401.  Rule 402 provides that "[all] relevant evidence is admissible [...] Evidence which is not relevant is not admissible."  Although definition of "relevant evidence" is broad, it has limits; evidence must be probative of a fact of consequence in the matter and must have tendency to make existence of that fact more or less probable than it would have been without evidence.  *United States v. Curlin*, 489 F.3d 935, 943-44 (9th Cir. 2007).

Hearsay is a statement, other than one made by the declarant,

offered in evidence to prove the truth of the matter asserted.  Fed R. Evid. 801(c).  Hearsay is not admissible except as provided by the Federal Rules of Evidence, or other rules prescribed by the Supreme Court.  Fed R. Evid. 802.

Defendant's objections are, for the most part, sustained.  In order to enforce the standards set forth in Federal Rules of Civil Procedure and the Federal Rules of Evidence, any statements in the declaration containing inadmissible hearsay, speculation, or not made on the basis of his personal knowledge are disregarded.  Any assertions made by Plaintiff that are contrary to the judicially noticed record are insufficient to establish a genuine issue of material fact.

## IV.  LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier

of fact could find other than for the moving party." *Soremekun v. Thrifty Payless*, Inc., 509 F.3d 978, 984 (9th Cir.2007).  With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).  "[A] non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *Id*. (emphasis in original). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In determining whether a genuine dispute exists, a district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.

1

### V. DISCUSSION

2

**A.   Timeliness - Compliance with 42 U.S.C. § 2000e**

3

Title VII provides that it shall be an unlawful employment

4

practice for an employer "to fail or refuse to hire or to discharge

5

any individual with respect to his compensation, terms, conditions,

6

or privileges of employment, because of such individual's race,

7

color, religion, sex, or national origin." 42 U.S.C. § 2000e-

8

2(a)(1). The employer is also prohibited from retaliating against

9

an employee for opposing an unlawful employment practice or making

10

a charge in an employment discrimination investigation or

11

proceeding. *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1558-59 (9th Cir.

12

1994). The antiretaliation provision of Title VII states:

13

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees
> or applicants for employment, for an employment

14

> agency, or joint labor-management committee
> controlling apprenticeship or other training or

15

> retraining, including on-the-job training programs, to
> discriminate against any individual, or for a labor

16

> organization to discriminate against any member
> thereof or applicant for membership, because he has

17

> opposed any practice made an unlawful employment
> practice by this subchapter, or because he has made a

18

> charge, testified, assisted, or participated in any
> manner in an investigation, proceeding, or hearing

19

> under this subchapter.

20

21

42 U.S.C. § 2000e-3(a).

22

Sexual harassment is a type of sex discrimination prohibited

23

by Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57,

24

63-67 (1986). Accordingly, an employer's retaliatory conduct in

25

response to an employee's complaint of sexual harassment, a

26

protected activity, is actionable under Title VII's antiretaliation

27

provision. *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951,

28

965 (9th Cir. 2004); *Garcia v. Los Banos Unified Sch. Dist.*, 418

23

F.Supp.2d 1194, 1224 (E.D. Cal. 2006).   A precondition to suit under Title VII is that a plaintiff must first exhaust the administrative remedies available under 42 U.S.C. § 2000e-5.   *See Karim-Panahi v. L.A. Police Dept.*, 839 F.2d 621, 626 (9th Cir. 1988).

Under the statute, a plaintiff must initially file a timely charge with the EEOC and, if dismissed, receive a right-to-sue letter from the agency and then file any related court action within 90 days of receipt of the letter.  *Id.*; 42 U.S.C. § 2000e-5(f)(1).   Title VII mandates that claims be filed with the EEOC within 300 days of the alleged discriminatory act(s) if the state in which the discriminatory act occurred has a state agency that deals with such matters and the complainant has instituted proceedings with that agency, or within 30 days of receiving notice that the state agency has terminated its proceedings, whichever is earlier.   42 U.S.C. § 2000e-5(e)(1).   If no state agency exists, the time limit is 180 days.  *Id.*  The United States Supreme Court has explained:

> An individual must file a charge within the statutory time period and serve notice upon the person against whom the charge is made.   In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).   If not filed within these time limits, a claim is "time barred."   *Id.*

In California, a plaintiff who first files charges with the California Department of Fair Employment and Housing ("DFEH") must

24

file the charge with the EEOC within 300 days of the alleged unlawful practice.  *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000).  However, filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Such doctrines are to be applied sparingly.  *Nat'l R.R.*, 536 U.S. at 113-14.

Title VII authorizes the EEOC to enter into "worksharing" agreements with state and local fair employment practice ("FEP") agencies to "establish effective and integrated resolution procedures."  42 U.S.C. § 2000e-8(b); 29 C.F.R. § 1601.13(c). The DFEH is a designated FEP agency under Title VII and has entered into a worksharing agreement with the EEOC.  29 C.F.R. § 1601.74; *Green v. Los Angeles County Superintendent of Sch.*, 883 F.2d 1472, 1476 (9th Cir. 1989).  The Ninth Circuit has held that, under this worksharing agreement, a charge filed with the DFEH is deemed constructively filed with the EEOC because the EEOC and DFEH cross-designate the other as its agent for the purpose of receiving charges. *EEOC v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000) ("Constructive filing is made possible by 'worksharing agreements,' which designate the EEOC and the state agency each other's agents for the purpose of receiving charges.");  *Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172, 1175 (9th Cir. 1999) ("[A] charge filed with the state agency before the 300-day filing deadline expires is deemed automatically filed with the EEOC on that same day.");  *Green*, 883 F.2d at 1475-76 (holding that, under

25

EEOC-DFEH worksharing agreement, charge filed with DFEH is deemed to have been filed with the EEOC on the same day); *Paige v. State of Cal.*, 102 F.3d 1035, 1041 (9th Cir. 1996) ("[T]he filing of a charge with one agency is deemed to be a filing with both.") In addition, for purposes of determining whether a charge filed with an FEP agency has been constructively filed with the EEOC, the Ninth Circuit has determined that whether the state agency actually forwarded the charge to the EEOC or whether the EEOC actually received it is irrelevant. *Laquaglia*, 186 F.3d at 1175; *Dinuba Med. Clinic*, 222 F.3d at 585.

Whether the dual filing doctrine applies to save Plaintiff's claim depends on when Plaintiff filed his DFEH verified complaint or "B" Complaint.   Plaintiff contends he mailed a completed B Complaint form to DFEH on November 30, 2002, which is approximately 208 days after he was suspended from duty by Defendant.[11] If this allegation is true, Plaintiff's complaint would have been filed with DFEH within the 300-day timely filing period prescribed by Title VII.  Under the constructive filing doctrine, the DFEH charge is deemed filed with the EEOC on the same day, e.g. within approximately 208 days of the alleged retaliatory act, which would make the charge timely filed for purposes of Title VII's administrative exhaustion requirements.

Defendant disputes Plaintiff's assertion that he filed his complaint with DFEH in November 2002, arguing that the agency's records show Plaintiff filed his complaint with DFEH on June 2,

---

[11] Plaintiff also argues that he made an "in-person" complaint to Mr. Gonzalez at the DFEH's Fresno office on November 19, 2002. This argument is addressed in Part V(A)(d), *infra*.

26

2006[12] and requests judicial notice of a copy of Plaintiff's DFEH complaint that shows Plaintiff's signature dated November 30, 2002 but also reveals a date-stamp of June 2, 2006 in a box marked "Received Dept. of Fair Employment & Housing Fresno District Office." (Doc. 79, Exh. F.) Judicial notice was previously taken of this document in the January 17, 2008 and March 31, 2009 orders pursuant to Fed.R.Evid. 201(b) on the ground that it is an official record of a state administrative agency. *See Interstate Natural Gas Co. v. Southern Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953). On the same ground, Defendant's request for judicial notice of this document is granted.[13]  Fed. R. Evid. 201.

To bring a civil action under FEHA, the aggrieved person must exhaust the administrative remedies provided by California law. *Yurick v. Superior Court*, 209 Cal.App.3d 1116, 1121 (1989); *accord Romano v. Rockwell Int'l, Inc.*, 14 Cal.4th 479, 492 (1996). Exhaustion in this context requires filing a verified complaint

---

[12] Defendant's version of events is straightforward and, for the most part, undisputed: Plaintiff met with DFEH consultant Gonzalez on May 19, 2002 to discuss possible claims against the District. On May 25, 2002, Mr. Gonzalez sent Plaintiff a letter, explaining that the DFEH would not take a complaint for investigation on Plaintiff's behalf. Mr. Gonzalez enclosed a "B Complaint" and explained in the letter that Plaintiff needed to complete the B Complaint in order to obtain a "right to sue" notice and file a lawsuit. According to Defendant, Plaintiff did not return the B Complaint until June 2, 2006, instead opting to focus on his state law appeals.

[13] Defendant also requests judicial notice of the January 17, 2008 and March 31, 2009 orders and the docket in this case. Because these are matters of public record, the request for judicial notice is granted. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.")

with DFEH within one year of the alleged unlawful employment discrimination, and obtaining notice from DFEH of the right to sue. Cal. Gov't Code § 12960(d).  Neither unverified written information nor oral information relayed to DFEH may substitute for a formal administrative charge:

> The statute does not authorize any alternative to the requirement of the filing of a "verified complaint in writing." Moreover, it would not be practical to allow an employee to substitute unverified information relayed to the DFEH in correspondence, or orally, for a formal administrative charge. The requirement of a "verified complaint in writing" ensures that all interested parties are on notice as to the substance of the allegations.

*Cole v. Antelope Valley Union High Sch. Dist.*, 47 Cal.App.4th 1505, 1515 (1996).

FEHA's verified complaint requirement is well-established in the Ninth Circuit.  *See Rodriguez v. Airborne Express*, 265 F.3d 890, 897 (9th Cir. 2001) (recognizing the holding in *Cole v. Antelope Valley Union High Sch. Dist.*, 47 Cal.App.4th 1505, (1996)); *Watson v. Chubb & Sons, Inc.*, 32 F. App'x 827 (9th Cir. 2002) (stating that "[f]illing out a pre-complaint questionnaire, alone, was insufficient to exhaust her administrative remedies [under FEHA]."); *Peoples v. County of Contra Costa*, No. C 07-00051 MHP, 2008 WL 2225671 (N.D. Cal. May 28, 2008).

This summary judgment motion is Defendant's third challenge to the timeliness of Plaintiff's verified or "B" Complaint.  On June 22, 2007, Defendant filed a motion to dismiss, arguing that Plaintiff's retaliation claim is barred because the DFEH's date stamp established that Plaintiff filed his complaint with DFEH on June 2, 2006.  In the January 18, 2007 order, granting Defendant's

motion to dismiss, it was determined that because Plaintiff's allegation as to the date he filed his DFEH complaint contradicted the DFEH public record, it was disregarded.  However, Plaintiff was granted leave to amend.

On March 12, 2008, Plaintiff filed a First Amended Complaint, which included new documents and expanded upon his original allegations concerning the timing of his "B" Complaint.  Defendant moved to dismiss Plaintiff's Title VII claim on April 23, 2008. The motion was granted in part and denied in part on March 31, 2009.  In the March 31 order, it was determined that Plaintiff's description of his attempts to contact DFEH many additional times raised the possibility of agency neglect or mishandling of Plaintiff's complaint:

> One explanation for the contradiction between the allegations and evidence Plaintiff presents and the DFEH complaint form date-stamped June 2, 2006 which has been judicially noticed is that Plaintiff returned the form as he alleges in November 2002 and DFEH failed to process it until June 2006, perhaps misfiling or misplacing the form. It is also possible that, as Defendant maintains, Plaintiff signed and dated the form on November 30, 2002 but failed to actually submit it to DFEH until June 2006. Defendant himself acknowledges the contradiction, arguing the November 25 notice is inconsistent with the June 2, 2006 complaint form marked "filed" and "received."  A question of fact exists as to when Plaintiff filed his complaint with DFEH, an issue central to resolving the question of whether Plaintiff's DFEH complaint is properly considered a constructive filing with the EEOC. "It is well-established that questions of fact cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted." (Citations omitted)

(Doc. 66, pg. 29:23-30:8.)

Defendant moves for summary judgment, arguing that "discovery has eliminated any doubt regarding when Plaintiff actually

submitted his verified complaint to the DFEH." (Doc. 75, 10:8-10:10.) Defendant contends that there is no triable issue of fact that the DFEH received Plaintiff's B Complaint by fax on June 2, 2006, namely (a) the DFEH file between November 19, 2002, (b) the fax information found at the top of Plaintiff's B Complaint, (c) Plaintiff's efforts to backdate his B Complaint, and (d) Plaintiff's own inconsistencies throughout this case.

### a. *DFEH File*

In support of its "elimination of doubt" argument, Defendant points first to Plaintiff's DFEH file, produced by the DFEH during discovery. The file shows that the first document the DFEH received from Plaintiff after Mr. Gonzalez's November 25, 2002 letter is the signed B complaint, which is file-stamped received on June 2, 2006. There is no record of any complaint filed by Plaintiff or on his behalf prior to June 2, 2006.

Plaintiff contends that he mailed a "B" Complaint to the DFEH on November 30, 2002. To support this contention, Plaintiff submits the declaration of Mr. Stephen Richardson, who Plaintiff maintains "witnessed [him] correct, complete, sign, date, and mail the [B Complaint] on November 22, 2009." As explained in Part III(a), *supra*, Mr. Richardson's statement does not comply with 28 U.S.C. § 1746, which requires that a declaration must be made under penalty of perjury and must be attested to be true. The lack of a penalty of perjury clause undermines the credibility of these assertions. It also violates Rule 56(e).

Plaintiff also states that he "vigorously followed up with Mr. Gonzalez, to whom he had written twelve times since returning the

'B Complaint' on November, 2002." (Doc. 90, 6:9-6:12.) Yet Plaintiff has not produced one copy of these letters. Defendant counters that the DFEH's file on Plaintiff, produced during discovery, does not contain a single letter from Plaintiff to Mr. Gonzalez between November 19, 2002 and June 2, 2006. However, Plaintiff addressed the absence of his letters to Mr. Gonzalez during oral argument,[14] stating that "the DFEH does not keep case files beyond three years" and referencing a letter from Ms. Reyes to Plaintiff on August 17, 2006:

> DFEH does not retain case files beyond three years after a complaint is filed, unless the case is open and at the end of the three-year period.

(Doc. 79, Exh. E.)

Plaintiff did not address why he has no copies of these letters.

### b. *Fax Information*

Defendant asserts that the fax information contained on the top of the B Complaint "erases all uncertainty" that the DFEH received the Complaint on June 2, 2006. At the top of the DFEH's copy of the B Complaint, is information indicating that it was faxed to the DFEH on June 2, 2006 from the fax number 559-227-9355. The fax number 559-227-9355 corresponds to a church entity named "The Well," to which Plaintiff admits having an affiliation. More problematic is that the DFEH file contains an April 28, 2008 letter from Plaintiff to "Ms. Geraldine Reyes, DFEH" bearing the identical fax information. (Doc. 79, Exh. E.) Plaintiff admits faxing the

---

[14] Oral argument on Defendant's motion for summary judgment was held on August 17, 2009. (Doc. 101.)

April 28, 2008 letter to Ms. Reyes at the DFEH, but cannot explain how the identical fax number and information is present on the B Complaint.   The only inference a reasonable trier of fact could draw for the presence of the fax legend is that Plaintiff faxed or caused to be faxed his B complaint on June 2, 2006.  Plaintiff has no explanation or evidence to the contrary.[15]

### c.  *Backdating*

According to Defendant, Plaintiff twice attempted to manipulate the "June 2, 2006" date on his B Complaint by calling Ms. Reyes and requesting that she backdate his B Complaint to 2002. Ms. Reyes testified in her deposition that on June 6, 2006, Plaintiff contacted the DFEH, asking Ms. Reyes to issue a Right to Sue notice backdated to 2002.  Ms. Reyes told Plaintiff that DFEH had no record of him filing his B Complaint in 2002 and refused to backdate the notice.

In April or May 2008, Plaintiff again contacted Ms. Reyes in an attempt to backdate his Right to Sue notice.  Ms. Reyes denied Plaintiff's request and sent Plaintiff a confirming letter on May 16, 2008:

> This letter is to memorialize our conversation regarding your request to receive a right to sue letter back-dated sometime in or about November 22, 2002.  As I have informed you, we have no record of receiving a signed Complaint for the Purpose of Filing Only ("B" Complaint) in or about November 22, 2002. We do have a record of you contacting the Department in June of 2006.  The documentation included a "B" Complaint dated November 30, 2002.  Unfortunately, we were unable to backdate the complaint and therefore

---

[15] At oral argument on August 17, 2009, in response to Defendant's fax legend argument, Plaintiff stated: "I don't know how to explain that."

the Department filed it effective June 2, 2006.

Defendant asserts that Plaintiff concealed his backdating efforts by omitting the April 28, 2008 letter from Plaintiff to DFEH making the backdating request, and Ms. Reyes' May 16, 2008 letter, from his discovery responses.[16]   At his April 27, 2009 deposition, Plaintiff stated that he "forgot" about the April 28, 2008 letter, leaving it in a drawer at his church.   Concerning Ms. Reyes' May 16, 2008 letter, Plaintiff states that he never received it.

### d.   *Plaintiff's Alleged Inconsistencies*

Defendant contends that Plaintiff's changed positions provide direct evidence that he did not mail the B Complaint on November 30, 2002.   Defendant points out that Plaintiff's original complaint, filed on March 29, 2007, does not mention Plaintiff mailing the B Complaint on November 30, 2002:

> I also notified the California Department of Fair Employment and Housing in November, 2002, that I was concerned that the SCCCD had ignored my complaint of discrimination and sexual harassment against Dr. Mericle and that it, the District, was proceeding to take steps that seemed to point toward my dismissal for reasons that had nothing to do with performance or wrong-doing.   In fact, none of the accusations identified any duty or responsibility of faculty that I hadn't performed and none identified any policy, rule, or regulation that I had violated.   The DFEH investigator told me that he would keep the case open until my administrative remedies were exhausted.
>
> [...]

---

[16] Defendant confronted Plaintiff with this information at his April 27, 2009 deposition.   Plaintiff denied any knowledge of the letter, suggesting that it would defy all logic to backdate his Right to Sue notice because it would present statute of limitations problems.

> **Based on the foregoing, with some elaboration, the DFEH issued me a "right -to - sue" letter on August 17, 2006. I then asked the U.S. EEOC to investigate and it issued me a "right - to - sue" letter on December 29, 2006. A copy of the EEOC letter is attached to this complaint.**

According to Defendant, Plaintiff did not mention mailing the B Complaint to the DFEH, whether on November 30, 2002 or otherwise, until he filed his First Amended Complaint. Specifically, on June 22, 2007, Defendant moved to dismiss Plaintiff's retaliation claim because the date stamp established that Plaintiff filed his complaint with DFEH on June 2, 2006. In his opposition, Plaintiff insisted that he did not mail the B Complaint to the DFEH on November 30, 2002, instead stating, "[i]t is an irrefutable fact that Plaintiff alleged retaliation in a complaint to the California Department of Fair Housing and Employment made on November 19, 2002." (Doc. 90, 3:3-3:6.)

In his first amended complaint, ("FAC"), Plaintiff alleged for the first time that he mailed the B Complaint to the DFEH on November 30, 2002. Plaintiff maintained this story during his April 27, 2009 deposition, as well as in his opposition to this motion. However, on May 6, 2009, in response to Defendant's Special Interrogatory No. 16, and in total contradiction to his FAC, Plaintiff stated, "it is NOT my contention now, nor has it ever been that I mailed a complaint to the DFEH. I made my complaint in person on November 19, 2002." (Doc. 79, Exh. J.) (emphasis added). In responding to Request For Admission No. 3, also on May 6, 2009, Plaintiff admitted that he did not mail the DFEH Complaint in 2002:

**34**

**REQUEST FOR ADMISSION NO. 3:**

Admit that you did not mail the DFEH COMPLAINT to the DFEH at any time in 2002.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3**

Plaintiff admits Defendant's No. 3.  The Complaint in question was made in person at Plaintiff's interview on November 19, 2002.

(Doc. 79, Exh. I.)

Defendant contends that Plaintiff's shifting and contradictory positions demonstrate that he did not mail the B Complaint to the DFEH on November 30, 2002.  Plaintiff submits that his position never changed; he maintains that he filed an in-person complaint on November 19, 2002 *and* mailed his B Complaint on November 30, 2002. Plaintiff's conduct, at best, shows a willful attempt to manipulate the truth to avoid the consequences of his own actions.

### 1.   Conclusion re: Constructive Filing

The March 31 order determined that "[o]ne explanation for the contradiction between the allegations and evidence Plaintiff presents and the DFEH complaint form date-stamped June 2, 2006 is that Plaintiff returned the form as he alleges in November 2002 and DFEH failed to process it until June 2006, perhaps misfiling or misplacing the form."  (Doc. 66, 29:24-30:4.)

Here, Defendant claims that it has "erased all uncertainty" concerning when the DFEH received Plaintiff's B Complaint - that, based on the record, it was faxed to the DFEH from "The Well" on June 2, 2006.  In support, Defendant District has provided deposition testimony from two DFEH employees stating that they did not receive Plaintiff's verified complaint between November 30,

2002 and June 2, 2006.  (Doc. 79, Exhibits B & C.)  Defendant also furnishes the DFEH file containing the date-stamped B Complaint with the fax authentication on the top of the page.   The fax information on top of the B Complaint is identical to documents sent by Plaintiff to the DFEH on April 29, 2008, which Plaintiff cannot explain.  Conspicuously absent from the DFEH file are the twelve letters Plaintiff says he sent to the Mr. Gonzalez between November 30, 2002 and June 2, 2006 and of which he has not copies.  More telling is Ms. Reyes' deposition testimony concerning Plaintiff's attempts to have DFEH backdate his B Complaint to 2002.

Plaintiff, however, provides a sworn affidavit stating that he filed a complaint with the Mr. Gonzalez at the DFEH's Fresno office on November 19, 2002, and, on November 30, 2002, mailed a completed B Complaint to the DFEH.   As to the absence of documents and correspondence in his DFEH file, Defendant points to the August 17, 2006 letter from Ms. Reyes stating that the DFEH does not retain case files beyond three years after a complaint is filed.  Part of the reason for this deplorable state of the evidence is Plaintiff's dilatory conduct in waiting to bring these claims until 2007.

Because Defendant's summary judgment motion is resolved on other grounds, it is unnecessary to resolve whether a rational trier of fact could infer that Plaintiff mailed his B Complaint to the DFEH on November 30, 2002.  It is discussed because Defendant advanced the issue of time-bar.  Defendant's motion for summary judgment is DENIED WITHOUT PREJUDICE on the issue of time-bar.

Plaintiff also argues that the doctrine of equitable tolling should apply to prevent his claim from being barred and that the November 25, 2002 letter from the DFEH was ambiguous, leading him

to believe that his complaint was filed for purposes of maintaining a private law suit.   Since there is sufficient reason to grant Defendant's summary judgment motion on other grounds, these arguments need not be resolved.

**B.   <u>Merits of Plaintiff's Title VII Retaliation Claim</u>**

Assuming, arguendo, that Plaintiff's verified complaint was timely filed, summary judgment will be granted for Defendant because it has presented substantial evidence of legitimate and non-discriminatory reasons for suspending Plaintiff on May 6, 2002 and terminating his employment on January 7, 2009, namely that he was unfit for service, dishonest, and persistently violated state laws and District regulations.   Summary judgment is also appropriate because Plaintiff has not demonstrated a pretextual reason for his dismissal.

To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994).   Causation "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *see also Flait v. No. American Watch Corp.*, 3 Cal. App.4th 467, 478, 4 Cal. Rptr. 2d 522 (1992) (reversing judgment for employer on motion for summary adjudication where circumstantial

**evidence of causal link raised issue of fact).**

**Once plaintiff produces evidence supporting a prima facie case, the burden shifts to the defendant employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Once the employer articulates such a reason, a plaintiff bears the burden of demonstrating that the reason was merely a pretext for the unlawful retaliatory motive.** *Stegall v. Citadel Broad. Co.***, 350 F.3d 1061, 1066 (9th Cir. 2003). A plaintiff can prove pretext with either direct or indirect evidence. If a plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial. When direct evidence is unavailable, however, and the plaintiff proffers only circumstantial evidence that the employer's motives were different from its stated motives, specific and substantial evidence of pretext is required to survive summary judgment.** *See id.* **(citing** *Godwin v. Hunt Wesson, Inc.***, 150 F.3d 1217, 1221 (9th Cir. 1998)).**

**Even if Plaintiff established a prima facie case of discrimination, which he has not,[17] Defendant has articulated**

---

[17] It is not clear that Plaintiff has produced sufficient evidence regarding the first prong, i.e., that Plaintiff engaged in protected activity. In his opposition, Plaintiff alleges that he engaged in protected activity when he filed a sexual harassment complaint with the District on March 19, 2002. However, Plaintiff's assertions regarding when (and to whom) he filed the complaint to have varied during the course of this litigation. To counter Plaintiff's accounts, Defendant filed the declarations of Mr. Rowe, Mr. Cantu, and Dean Mericle, who each declare that Plaintiff did not file a sexual harassment complaint with them and they had no knowledge of his alleged harassment until 2008, at the earliest. Defendant also points out that the form Plaintiff produces as evidence of his sexual harassment complaint is not the form the District used between 1980 and the present, listing

legitimate, non-discriminatory reasons for his termination. *See Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1123- 24 (9th Cir. 2000) (once a prima facie case has been shown, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."). Defendant had ample, lawful grounds for suspending Plaintiff on May 6, 2002, and terminating his employment on January 7, 2003. Among other things, Plaintiff was combative and unreceptive to instruction and correction. That alone is sufficient for purposes of satisfying the McDonnell Douglas test. *See Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1075 (9th Cir.2003) (employee's poor attitude and failure to maintain strong working relationships with co-workers satisfied legitimate, non-discriminatory reasons for termination).

Defendant has set submitted considerable evidence to support its proffered legitimate reason for Plaintiff's termination: that Plaintiff's harsh and inappropriate treatment of Fresno City College faculty members, students, and employees violated school policy and called into question his fitness as a faculty member. Failure to perform in accordance with standards set by the employer is sufficient to constitute a legitimate business reason for termination. *See Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985) (holding that Title VII does not protect employee who violates employer's rules, disobeys orders and disrupts the work environment); *Mansur v. Peralta Community College Dist.,* 216 F.3d

---

campuses that did not exist in 2002 and not reflecting three additional campuses added by the District in the 1990's, casting further doubt on the propriety of Plaintiff's litigation conduct.

1083 (9th Cir. 2000).  The record includes direct evidence that Plaintiff's conduct adversely affected students and teachers on a number of occasions, in a variety of settings, and throughout the three year period covered by the allegations.  The record also demonstrates that Plaintiff knew of the school's policies prior to his suspension and termination.[18]

Defendant also seeks judicial notice of the opinions by ALJ Smith and the Fifth District Court of Appeal to support its argument that Plaintiff's termination was made for legitimate, non-discriminatory reasons.  As the opinions are matters of public record, the request for judicial notice is granted.  ALJ Smith's 43-page opinion outlines the more than forty factual findings, including that Plaintiff made derogatory and disparaging remarks to students, gave female students grades they did not earn, and pursued his personal interests to the detriment of the rights and interests of his students, coworkers, teachers and administrators, frequently to their detriment.  The ALJ made the following findings of fact and law concerning Plaintiff's evident unfitness:

> 26.  The District proved that Dr. Davenport is evidently unfit for service, within the meaning of section 87732(d).  The evidence reveals repeated and varied instances of very poor and imprudent judgment, a lack of discretion, a deep disdain for a certain cross section of his students and coworkers and several instances where Dr. Davenport has not been

---

[18] Defendant presents substantial evidence that it terminated Plaintiff's employment because it was concerned about Plaintiff's treatment of female students at Fresno City College and whether he could maintain the professional standards of a faculty member.  The District believed that Plaintiff's comments and dealings with female students were inappropriate, insensitive, and in violation of school policy.  The District also believed that Plaintiff's outward disdain for students he perceived to be lazy or underachieving supported his unfitness for service.

able or willing to prevent his temperament, personal
life and attitudes from encroaching upon his work and
negatively impacting his students, fellow staff and
administrators.   These several instances reflect a
deficit in temperament, within the meaning of section
87732(d) and as that term is explained in the Woodland
decision.

27.  Dr. Davenport allowed his failing relationship
with Ms. Fipps to nearly destroy him.  He brought
those personal troubles to class with him, and to
staff persons who were willing to listen.   He
traumatized students and peers with his talk of
suicide, and demonstrated especially poor judgment by
telling students that he was "on the edge" and that
they needed perform well on his exam.  The implication
that he might follow through on his suicide threats if
they performed poorly on his exam was clear. He also
showed poor judgment and made it clear to all his
students that preferential treatment was available for
a student with whom he sought a personal relationship
when he offered extra credit for students who attended
the Book Faire at Ms. Fipps' child's school and
purchased a book.

28. Dr. Davenport's behavior toward Jana Howard and
Sabrina    Sortwell   demonstrated    a    different
manifestation of poor judgment and temperamental
deficit. Counsel correctly contends that there is no
statute, regulation or Board policy that forbids
teachers from seeking social relationships with or
even   dating   adult   students.    Dr.   Davenport
unapologetically made it clear that he sees nothing
inappropriate about seeking social relationships and
dates from the female students who attend FCC, and he
made it clear that he feels his rights of free
association are being encroached by any rule or
directive that would prevent him from socializing with
any female student receptive to his advances. The
clear import of his testimony was that he has no
intention of restricting his actions in seeking
personal social relationships with female students
attractive to him, regardless of what the District
thinks of the matter, unless there is a specific
policy, law or rule prohibiting such association.

30. The effort to capitalize upon the disparity in
status between professor and student was particularly
evident in Dr. Davenport's approaches to Ms. Sortwell.
Less obvious but still apparent was the same disparity
in status when he approached Ms. Howard with his
surprisingly crude marriage proposal. Ms. Howard was
not a student of Dr. Davenport's at the time, but he
was still a FCC professor and Ms. Howard had no idea
Dr. Davenport was on leave. Analysis of the effects of

41

the conduct must be made from what Ms. Howard and Ms. Sortwell knew and perceived, not what Dr. Davenport knew or intended. Ms. Sortwell was both a student and a student employee working in his class. His approach was "very forward", and was most unwelcome. Ms. Sortwell had enough self-assurance to successfully handle the matter herself, but that does not diminish the fact that Dr. Davenport used his position and status as an entree to seek a personal relationship with her. The common denominator between the two instances is that Dr. Davenport's status as a professor and the females' understanding of his status was the connection to the women from which he made his approaches. In mitigation, Dr. Davenport respected Ms. Sortwell's demand that he cease his approaches to her. In aggravation, Dr. Davenport made it clear that he would have pursued the relationship, had she not objected, and would do so with other female students similarly situated if he were attracted to them and they were receptive to his overtures. Thus, although not evidence of violation of any specific statute, regulation or Board policy, Dr. Davenport's attitude toward pursuit of social and personal relationships with students at the institution where he teaches, as carried out with Ms. Howard and Ms. Sortwell, is nevertheless evidence of a deficit in temperament that Dr. Davenport has no intention of changing.

31. Dr. Davenport also demonstrated a recurring demeaning attitude toward and disrespectful treatment of fellow staff and peers. In Factual Findings 23 and 24, Dr. Davenport was petulant, very disrespectful and demeaning toward campus police who were expecting Dr. Davenport to obey the order that he not be present on campus when he was on administrative leave in October 2000. He berated the campus police in March 2002 for their failure to meet his expectations for prompt response and protection from students who were in an uproar resulting from his own imprudence. His disrespectful and abusive demeanor and verbally inappropriate behavior toward Kelli O'Rourke on two separate instances is additional evidence of this trait. Regardless of the validity of his complaints about the computer's failure to alphabetize his roster and the merit of his objection to the request that he mentor an adjunct, he had no business taking out his frustrations on Ms. O'Rourke when the object of his ire happened to be away from her office when he came in to vent. Dr. Davenport's frustrations with Mr. Farrington's parliamentary coup'd etat on the agenda item Mr. Fanington knew was of intense personal interest to Dr. Davenport is understandable. But Dr. Davenport's temper tantrum and verbal abuse of Mr. Farrington reflected the same trait as was evident in

42

the other incidents above, where those frustrations are vented, at times abusively, upon whoever happens to be available. Dr. Davenport's presence on campus on October 6,2000, in defiance of a direct order, and his attempting to conceal grade packages from his Dean, reflect an intentional defiance of the District's authority.

32. Particularly troubling and supportive of a finding of evident unfitness for service is Dr. Davenport's repeatedly manifested deep and abiding disdain for those students he determines are lazy, underperformers or underachievers. As set forth in Factual Findings 32-34, the exceedingly derogatory comments he wrote in Mr. Deol's test booklet, and particularly his surprisingly frank but exceptionally demeaning explanation of his conduct to Ms. Ikeda; Findings 43-47, posting the names of failing students on the overhead projector; his comments to the day class the next day; and in Findings 48-49, his behavior toward Ms. Stickler, are significant evidence of this disdain.

33. Dr. Davenport's posting the names of students he was dropping for failure to benefit from instruction was evidence of exceptionally poor judgment, and his comments the next day to his day class reflected his low regard for students who failed his examinations, regardless of the reasons or circumstances. There was no doubt that everyone in the classroom knew the students whose names were posted on the overhead projection had failed the examination and were being dropped for that reason. His claim that he was prevented from explaining the rest of his offer; to permit an option to those failing to remain in the class and bring up their grade, does not cure the basic defect, even had it been delivered as planned. Whether the students who, after the projection of their full names before the entire 150 plus student class, had the option to remain to try to pull their grade up, does not cure the effects of the public disgrace and humiliation already suffered by a public posting of their failure and attachment of a label to them, "failing to benefit from instruction."

39. Dr. Davenport's denial to Dean Mericle that he made derogatory and disparaging remarks to a student seeking help on a term paper who turned out to be Ms. Stickler was dishonest. His elaborate rationalization about why he thought he was justified in posting the names of failing students he was dropping from his class was dishonest... His denial that he gave a grade to Ms. Fipps that she did not earn was dishonest. His denial that he berated Ms. Upton for betraying his confidence was dishonest.

43

**55.  There is substantial evidence Dr. Davenport's conduct adversely affected students and teachers on a number of occasions, in a variety of settings, and throughout the three year period covered by the allegations. The near riot he caused when he posted failing students' names on the overhead in Mach 2002 not only disrupted his class, but Mr. Farrington's as well and required the police to be summoned. Students in his day class the next day already knew about the incident and asked him about it. Dr. Davenport's suicidal talk in class in the Summer of 2000 had similar large scale disruptive effects on students, and resulted in complaints from some students and even some parents of students. Dr. Davenport's humiliating remarks to Mr. Deol affected only him, but the posting of failing students' names on the overhead caused large scale disruption in both student and teacher lives, and Dean Mericle testified about all the work that was required to undo the involuntary drops and counsel students on their options after his inappropriate action. Dr. Davenport's abusive remarks disrupted all department faculty at the meeting in the Spring of 2002. His abusive diatribe disrupted the front office when he decided to take out his frustrations on Ms. O'Rourke. His abusive remarks to Ms. Upton resulted in more than one complaint to the administration. An enormous amount of administrative time in the District has been spent since 2000 dealing with the effects on students, faculty and staff as a result of Dr. Davenport' s conduct.**

**58.  Dr. Davenport's pursuit of his personal interests and attitudes appear in the various forms set forth above appear to consistently trump the rights and interests of his students, coworkers, teachers and administrators, frequently to their detriment.**

(Doc. 79, Exh. K.)


Similarly, the Fifth District Court of Appeal stated in its opinion upholding the ALJ's ruling, "[w]e conclude there is abundant evidence of Davenport's unfitness to teach." The Court of Appeal discussed the substantial evidence in the administrative record to support the ruling in favor of the District:

**Davenport's relationship with Fipps continued into the spring of 2000, when she finally told him she wanted to end it. Davenport, however, was persistent in his**

44

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

attempts to continue seeing Fipps, to the point she applied for a restraining order to keep him away from her. Davenport was very depressed about the breakup. On June 9,2000, he told the students in his summer school class that "Tricia," the woman he loved, had dumped him.  As a result, he had gotten drunk the night before and passed out on his kitchen floor. He had driven by the woman's house that morning, noticed her car was gone, and concluded she must have spent the night with another man. Then he told the students he was contemplating suicide. The only reason he had not killed himself, Davenport said, was because of them (his students). One student's mother reported the incident to campus police the following day, and the police notified the College administration. When asked about the incident, Davenport acknowledged his behavior had been inappropriate.

[...]

Sherry Upton, an office assistant and acquaintance of Davenport's who helped his larger classes, was present during the suicide threat and also reported it to the College officials. When Upton encountered Davenport again a week later, he was complaining angrily about the curriculum officer, Russ Mitchell. Davenport told Upton had found a solution to his problem. "[H]e was going to get a gun and shoot Mr. Mitchell. And then the cops would have to come and shoot him. And then they would both be out of their respective miseries." Upton filed a written report about the incident and later testified at the administrative hearing. Davenport denied having threatened to shoot Mitchell.

A week later, in the evening of June 20,2000, Davenport showed up at the house where Upton was staying and talked with her at length about his failed relationship with Fipps. Davenport told Upton he had purchased a gun. He said he was going to break into Fipps's house while she was at the coast with her new boyfriend, wait in her bedroom for them to return, and then shoot himself in front of her. Upton reported the statements the same night to Margaret Mericle, the associate dean of instruction for the social sciences division at the College (which includes the history department).  The next day Mericle telephoned Davenport's therapist, who reported the incident to Fresno police. The police went to Davenport's house but were unable to locate him. He had left the house to avoid them.  That night, June 21, Davenport telephoned Upton and accused her of telling his therapist about the gun. We told Upton she had "a big fucking mouth." Davenport denied saying that. Mericle called campus police when she arrived at work the next morning.  They intercepted Davenport on his way to

45

class and took him to Mericle's office, where they placed him in custody for a mental health evaluation. He was taken by ambulance to University Medical Center. The College put Davenport first on voluntary and then mandatory medical leave through the fall semester of 2000 and instructed him not to come onto the campus during that time. Nonetheless, he went without permission to the social sciences building on October 6 and had to be escorted off camps by police. Davenport became belligerent, called the officers 'Nazi storm troopers," and demanded they "get their fucking hands off me." He later testified that there were six officers (the police report said there were three), they had manhandled him, and one officer had drawn a gun.

[...]

Kim Reid was a teaching assistant who helped read and score Davenport's history exams, She also was a friend in whom he often confided about his breakup with Fipps. On the afternoon of June 19, 10 days after telling his students he might kill himself, Davenport went to Reid's house to talk to her. Reid's 15-year-old daughter was home at the time and present in the room during their conversation. Davenport told Reid he had stopped taking his medication, felt even more like committing suicide, and had made a list of ways to do it. He talked in detail about his sexual relationship with Fipps, over Reid's objection. And then he began flirting with Reid's daughter, telling her she had sexy lips, patting her on the leg, and encouraging her to put more weight on her butt because he liked women with large butts. Around this time, the postman arrived and delivered a Victoria's Secret catalog. Davenport looked through it with Reid's daughter. After a while, he used Reid's phone to order her daughter two pairs of pajamas and a bathing suit. Davenport left the house soon afterward but called later that evening to apologize for his behavior. Reid filed a written report about the incident with the College administration, She also testified at the administrative hearing.

[...]

Davenport taught a large night class in history during the spring semester in 2002. Ninety-two of the students, roughly half, failed a test he gave in late February. At the start of the next class session on March 5, Davenport posted the following message on an overhead projector: "Attention History 11, Tuesday 630 class, The following people have been dropped from this class for 'failure to benefit from instruction'. If your name is listed here, pick-up your test on the

46

front table, and go home. [Alphabetical list of 92 students.]" The message caused a near riot that had to be defused by campus police. One student, Christopher Brown, stood up and began to rally the others in protest, moving to the front of the classroom. Other students began to join in. Davenport tried to get Brown to "shut up and sit down." Brown refused, the atmosphere grew heated, and Davenport left the room to summon police. The first officer to arrive at the scene was Martin Rey. He was met by Davenport, whom Rey described as "visibly upset . . . walking around yelling," demanding that Brown be removed from the classroom. A second officer, Christopher Caldwell, talked to Brown. The two officers managed to restore order after about 45 minutes ... By the time Mericle arrived at her office the next day, several students from Davenport's Tuesday night class already had called for appointments to see her. Mericle arranged to meet with the students, somewhere between 12 and 20 of them, the following Tuesday evening just before Davenport's next night class. She asked the students each to write a statement describing what had happened at the March 5 class [...] Mericle also interceded to prevent Davenport from dropping any of the 92 students from his class and called them to say they could remain if they wished. Some preferred to withdraw. Mericle met with Davenport sometime before meeting with the students and again afterward. The later meeting also included Anthony Cantu, the dean of instruction [...] Mericle and Cantu advised Davenport that school policy did not allow for this particular approach, and they instructed him to stop using it. They explained the policy permitted a faculty member to drop a student involuntarily only if the student's attendance had fallen below a certain level. Cantu would later testify that the phrase "failure to benefit from instruction" referred to the requirement a student take a minimum number of classes and maintain a minimum grade point average -- that he or she be making some progress toward graduation -- in order to be allowed to remain in school. Progress was to be measured over several semesters by the College, not by one instructor in a single class. In other words, the "failure to benefit" was not Davenport's call to make; a student had "a right to fail" a particular class. Davenport strenuously disagreed and argued he had the right as an instructor to manage his classes however he saw fit, without any interference from the administration.

[...]

Rajdeep Deol was one of the students whose name was posted as having been dropped from Davenport's evening class. Deol scored 57 points, out of a possible 150,

on the test that precipitated the March 5 incident. Davenport wrote in Deol's test booklet: "Terrible -- What have you been doing for the past six weeks? You have learned nothing, nada, zip.  If this is the result of best efforts at studying you better get used to the idea of working for minimum wage for the rest of you life."  Deol complained to Mericle. Mericle told Davenport the comments were not appropriate. Davenport, who acknowledged making these comments, and other similar ones to many other students, disagreed with Mericle's assessment and said he would take the matter to the academic senate. He argued it was his prerogative, and indeed his ethical obligation, to evaluate honestly the work of his students. At the administrative hearing, Davenport described the comments as a "motivational device."

[...]

Melinda Stickler, who worked at the College, was a student in one of Davenport's daytime classes in the spring of 2002. Early in the semester, she made an appointment with Davenport to meet him in his office to discuss a writing assignment. Stickler asked Davenport to look over her paper to determine whether she needed to make any changes. With that, Stickler testified, "He snatched the paper out of my hand, and he said, 'Are you fucking stupid? Do you want me to write the fucking paper myself?"' He was talking very loudly. "[H]is face was flushed and his eyes went beet red." Davenport tore up Stickler's paper and she left his office. The entire encounter lasted about two minutes. Stickler mentioned the incident to one of her colleagues, Janice Wong. Wong urged Stickler to report it to Mericle. Mericle referred Stickler to Ikeda, who asked Stickler to write an account of her meeting with Davenport. Both Mericle and Ikeda asked Davenport about the incident, without giving him Stickler's name... Davenport told Mericle and Ikeda that he could not recall recently having made a comment of this sort to any of his students. The ALJ concluded that, while it was understandable Davenport would not remember the student by name, his denial he made the comment was "not credible."

(Doc. 79, Exh. M.)

These findings to support the decision affirming the District's decision to terminate Plaintiff were affirmed by the Superior Court, State Court of Appeal, and cert. was denied in the California Supreme Court.  This final judgment is entitled to full

48

faith and credit.   28 U.S.C. § 1738.

Defendant has met its burden of demonstrating legitimate business reasons for terminating Plaintiff's employment.   The burden shifts back to Plaintiff to prove that the reasons were merely pretextual.   Plaintiff can do so by either showing that the articulated reason is "unworthy of credence" or that a discriminatory motive more likely motivated Defendant.   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).   A plaintiff may rely on circumstantial evidence to show pretext, but the evidence must be both specific and substantial.   *Id.*; *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir.2006)

Plaintiff has not presented any specific, much less substantial, evidence to raise a triable issue of fact that Defendant's proffered reasons for termination were merely a pretext for retaliation.   While plaintiff's burden at the summary judgment stage is not great, he cannot simply rely on generalizations and conjecture.   *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 661 (9th Cir. 2002); *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995); *see Martin v. Lockheed Missiles & Space Co.*, 29 Cal.App.4th 1718, 1735 (1994) (holding that speculation as to an employer's motive was insufficient to raise a triable issue regarding pretext).

The only circumstantial evidence that Plaintiff points to is the alleged procedural errors in investigating his termination, the lack of a negative performance review, and the alleged timing of his suspension and termination.   He does not deny the substantial evidence of or numerous corroborating witnesses against him.

Arguing that Defendant did not have a legitimate reason to

terminate him, Plaintiff refers, briefly, to the alleged procedural errors committed by the ALJ and the State Courts.[19]  This line of argument works entirely against Plaintiff, as demonstrated by ALJ's and Fifth Circuit's opinions in favor of the District.  As these judicial opinions demonstrate, there is no evidence Plaintiff was prevented from introducing any evidence in those tribunals.  Having previously taken his wrongful termination appeal to the California Supreme Court, Plaintiff cannot advance alleged procedural errors.[20]

To show pretext, Plaintiff next challenges the District's proferred reasons for his termination.  Plaintiff argues that he never received a negative performance review, signaling that he was terminated by the District for pretextual reasons.  The evidence, however, forecloses this contention.  As the ALJ points out, Plaintiff was terminated for (I) evident unfitness for service, (ii) dishonesty, and (iii) persistent violation of, or refusal to obey, the school laws of the state or District Regulations.  Plaintiff appealed the ALJ decision, which was upheld by the Fresno

---

[19] Following Plaintiff's termination on January 7, 2003, Plaintiff filed an appeal with the Office of Administrative Hearings, which was denied.  Plaintiff then appealed his adverse wrongful termination ruling to a series of state courts, including the Fresno County Superior Court and Fifth District Court of Appeal.  Both appeals were denied on the merits by written decisions.  Plaintiff's appeal ended when the California Supreme Court declined to review the Fifth District's decision regarding his termination.

[20] Plaintiff also argues that "Defendant has never identified any rule, regulation, or policy, alleged to have been violated by Dr. Davenport, nor any duty or responsibility Dr. Davenport did not perform satisfactorily."  (Doc. 90, 9:23-10:2.)  This is not accurate.  ALJ Smith and the Fifth District's opinions explain, in detail, the rules, regulations, and internal policies leading to Plaintiff's termination.

County Superior Court and the Fifth District Court of Appeal. Plaintiff's petition to the California Supreme Court was denied. Plaintiff had ample opportunity to demonstrate that his termination was unlawful, pretextual, or based on animus, but failed to do so. Nor is it inconsistent that Plaintiff never received a negative performance review prior to his termination.  If true, it merely shows that, prior to his suspension and termination, the District did not receive a formal negative performance review from a student.  This does not show pretext. *See, e.g.*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002.).

The only valid circumstantial evidence that Plaintiff points to is the timing of his suspension and termination.  Plaintiff correctly argues that very close temporal proximity of the protected activity and the adverse employment action can serve as evidence of pretext.[21]  *See, e.g., Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1069-70 (9th Cir. 2003).  However, timing alone, accompanied by evidence of Plaintiff's behavior problems, coupled with a complete lack of evidence of retaliatory intent, is neither specific nor substantial circumstantial evidence.[22]  *See*

[21] Plaintiff relies on *Fisher v. San Pedro Peninsula Hospital,* 214 Cal. App. 3d. 590 (1989), to assert that the pretext "may be established by an inference derived from circumstantial evidence such as the proximity in time between the protected action and the allegedly retaliatory employment decision." (Doc. 90, 10:22-11:2.) *Fisher* is distinguishable.  Unlike this case, Fisher dealt with the burden of proof on a demurrer - not a Rule 56 motion for summary judgment.

[22] Although Plaintiff presents evidence of temporal proximity, his retaliation claim is unlike those that have withstood summary judgment in the Ninth Circuit.  *See Bell v. Clackamas County*, 341 F.3d 858, 866 (9th Cir. 2003) (evidence of close temporal proximity may be sufficient to withstand summary judgment if complemented by

*Mitchell* v. *Superior Court of Cal. County of San Mateo*, 312 Fed.Appx. 893, 894 (9th Cir. 2009) (upholding summary judgment in favor of Defendant, stating that Plaintiff "has not offered any evidence other than the 'timing' to rebut what otherwise appears to be an effort by an employer to confront ballooning discoveries regarding an employee's inappropriate behavior"); *see also Yount v. Regent University, Inc.*, No. CV-08-8011-PCT-DGC, 2009 WL 995596 at *9 (D. Ariz. Apr. 9, 2009) (granting summary judgment in favor of Defendant, finding that "the evidence of temporal proximity is not a 'specific and substantial' indicator of pretext when viewed in isolation ... Plaintiff has failed to create a genuine issue of fact as to whether Defendant's proffered reasons were designed to conceal unlawful retaliation against his complaining email..."). As such, Plaintiff "has not shown that either ... a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Villiarimo*, 281 F.3d at 1063.

Moreover, there is no evidence that the decision-makers were aware of Plaintiff's alleged sexual harassment complaint when the District suspended Plaintiff on May 6, 2002 and terminated his

---

evidence that a plaintiff had no blemishes on his or her record prior to an adverse action); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002); *Chaung*, 225 F.3d at 1127; *see also Kotewa v. Living Indep. Network Corp.*, No. CV05-426-S-EJL, 2007 WL 433544 at *10 (D. Idaho Feb. 2, 2007) ("[T]he fact plaintiff was terminated within a few days of sending her [complaining] email alone may not establish circumstantial evidence of pretext, but when the timing is combined with the fact Kotewa had a good performance review the month before her termination, this is specific and sufficient circumstantial evidence of pretext to allow plaintiff to survive summary judgment.").

employment on January 7, 2003.  The decision to separate Plaintiff was made by Randy Rowe, Associate Vice Chancellor of Human Resources, whom Plaintiff concedes did not sexually harass him. According to Rowe's declaration, when he provided Dr. Davenport the May 6, 2002 letter, Rowe "had no knowledge that he had allegedly submitted a harassment complaint against Dr. Margaret Mericle, or any other District employee ... when I met with Dr. Davenport on May 6, 2006, he did not tell me he had submitted such a complaint." (Rowe Decl. ¶ 7.)  Rowe goes on to declare that Plaintiff did not mention his alleged sexual harassment complaint during Plaintiff's December 3, 2002 Skelly conference or his January 7, 2003 termination hearing, and Rowe attests he did not learn of "Dr. Davenport's ... sexual harassment claim until his April 27, 2009 deposition."   (Rowe Decl. ¶ 8-11.)  There is no indication in the record, and Plaintiff points to none, that Plaintiff's sexual harassment complaint was known of or played any role in the decision to suspend or terminate him.

Here, Plaintiff's unsupported and conclusory challenges regarding the District's reasons for his termination are insufficient as a matter of law.  *See Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.1983) (affirming summary judgment for employer where the plaintiff "produced no facts which, if believed, would have shown pretext and thus tendered an issue for trial."); *see also Surrell*, 518 F.3d at 1103 ("Conclusory statements without factual support are insufficient to defeat a motion for summary judgment.").   There is no direct evidence that the District terminated Plaintiff because of his complaint; all of the evidence shows that he was terminated because he was dishonest, unfit to

teach, and refused to obey laws and regulations.  Defendant has met its Rule 56 burden and demonstrated, as a matter of law, that Plaintiff's termination was not "merely pretextual," but rather categorically justified as definitively established in the state case.

Recent Ninth Circuit precedent is consistent with granting summary judgment in this case.  In *Mitchell v. Superior Court of Cal. County of San Mateo*, 312 F. App'x 893, Plaintiff sued her former employer, a state court, claiming employment discrimination and retaliation under Title VII.  The District Court for the Northern District of California granted summary judgment for the employer.  Affirming summary judgment, the Ninth Circuit rejected Plaintiff's argument that the "timeline of the Superior Court's actions 'speaks for itself' in establishing pretext:"

> [Plaintiff] has not offered any evidence other than the "timing" to rebut what otherwise appears to be an effort by an employer to confront ballooning discoveries regarding an employee's inappropriate behavior.  Under these circumstances, we refuse to make "a complaint tantamount to a 'get out of jail free' card" based solely on the timing of Mitchell's original DFEH complaint.  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000).

*Mitchell*, 312 F. App'x at 894.

After viewing the entirety of the evidence in Plaintiff's favor, drawing all inferences in his favor, and assuming arguendo that he could establish a prima facie case, he has not presented evidence giving rise to a triable issue of disputed material fact as to any pretext.  Summary judgment is GRANTED in favor of Defendant regarding the Plaintiff's ability to bring a retaliation

claim under Title VII.


## VI.  CONCLUSION

For the reasons discussed above:

1.   Summary judgment is GRANTED in favor of Defendant as to Plaintiff's remaining claim of retaliation under Title VII.

Defendant shall submit a form of final judgment consistent with this decision and the earlier decision terminating Plaintiff's wrongful termination claims, terminating this case in its entirety, within five (5) days of electronic service.


IT IS SO ORDERED.

Dated:    **August 24, 2009**            _____**/s/ Oliver W. Wanger**_____
                                        UNITED STATES DISTRICT JUDGE

55